516

## P.H. GLATFELTER COMPANY, Petitioner,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; William K. Reilly, in his official capacity as Administrator of the United States Environmental Protection Agency; Greer C. Tidwell, in his official capacity as Regional Administrator for the United States Environmental Protection Agency, Region IV, Respondents,

Weyerhauser Company; International Paper Company; Bowater Incorporated; Federal Paper Board Company, Incorporated, Amici Curiae.

No. 90–1488.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 31, 1990.

Decided Dec. 10, 1990.

David Gideon Mandelbaum, Ballard, Spahr, Andrews & Ingersoll, Philadelphia Pa., argued (Mary Jude Pigsley, Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., Richard C. Gaskins, Jr., Moore & Van Allen, Charlotte, N.C., Charles Dixon Case, Craig Alan Bromby, Moore & Van Allen, Raleigh, N.C., on pleading), for petitioner.

David Aiken Carson (argued), Environmental and Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., for respondent.

Before ERVIN, Chief Judge, and PHILLIPS and CHAPMAN, Circuit Judges.

CHAPMAN, Circuit Judge:

I.

Petitioner P.H. Glatfelter Company ("Glatfelter") owns and operates a pulp and paper mill known as Ecusta Mill in Transylvania County, North Carolina. The Ecusta Mill discharges wastewater into the French Broad River. Glatfelter holds a National Pollutant Discharge Elimination System ("NPDES") permit for Ecusta Mill's discharges which was issued by the State of North Carolina in 1988 and satisfies all requirements of the Clean Water Act ("CWA") and North Carolina law.

On February 2, 1989, the State of North Carolina, pursuant to section 304($l$) of the CWA, submitted to the United States Environmental Protection Agency ("EPA") a list of those waters in North Carolina that, due to discharges from point sources of certain pollutants, would likely not meet North Carolina's water quality standards ("WQSs") even after application of the technology-based controls mandated by the CWA. This list is known as the "B" list. 33 U.S.C. § 1314($l$)(1)(B) (1988). For each water segment listed on the "B" list, North Carolina also submitted, pursuant to sec-

tion 304(*l*), a list of the point sources discharging toxic pollutants "believed to be preventing or impairing" attainment of the applicable state WQSs. 33 U.S.C. § 1314(*l*)(1)(C) (1988). This list is known as the "C" list. For each discharger on the "C" list, the CWA requires the state to submit to the EPA an individual control strategy ("ICS") which the state determines will enable it to satisfy its WQSs within three years. 33 U.S.C. § 1314(*l*)(1)(D) (1988). In preparing its lists and ICSs, North Carolina did not place Ecusta Mill's receiving waters on its "B" list or Ecusta Mill on its "C" list, nor did it submit an ICS for Ecusta Mill. On June 2, 1989, EPA disapproved in part North Carolina's submission of "B" and "C" lists and ICSs, partially because of the exclusion of Ecusta Mill and its receiving waters from these lists. EPA's disapproval was based on its belief that the French Broad River near Ecusta Mill was being impaired by discharges of dioxin, a section 307(a) toxic pollutant, from Ecusta Mill. On November 28, 1989, North Carolina issued a proposed draft modified NPDES permit for Ecusta Mill in order to control dioxin discharges.

On February 6, 1990, as mandated by section 304(*l*)(3), 33 U.S.C. § 1314(*l*)(3) (1988), EPA implemented section 304(*l*)'s scheme for North Carolina by issuing "B" and "C" lists for North Carolina. EPA included the receiving waters immediately below Ecusta Mill on the "B" list and Ecusta Mill on the "C" list. EPA further conditionally approved North Carolina's draft modified NPDES permit as an acceptable ICS.

Glatfelter in this petition for review attempts under the provisions of section 509(b)(1)(G) of the CWA to challenge the EPA's actions with regard to the "B" and "C" lists. Glatfelter objects to placement of the Ecusta Mill and the water into which it discharges on the "B" and "C" lists and to the EPA's conditional approval of North Carolina's ICS. After considering the record and applicable statutes, we find that this court lacks jurisdiction to consider Glatfelter's petition, and we hereby dismiss this petition for review.

II.

Section 509(b)(1) of the CWA provides:

Review of the Administrator's action ... (G) in *promulgating any individual control strategy* under section 1314(*l*) of this title, may be had by any interested person in the Circuit Court of Appeals of the United States for the Federal judicial district in which such person resides or transacts business which is directly affected by such action upon application by such person.

33 U.S.C. § 1369(b)(1)(G) (1988) (emphasis added). Glatfelter argues that section 509(b)(1)(G) provides a proper basis for jurisdiction in this action. We disagree because we find the EPA has not "promulgated" an ICS in this case.

In reviewing a state-developed ICS, the EPA may approve, conditionally approve, or disapprove the ICS. 40 C.F.R. § 123.46(f) (1990). If the state ICS was in the form of a draft permit, as it was in this case, the EPA will either conditionally approve or disapprove it. *Id.* EPA's conditional approval of a state-developed ICS, however, is not binding on the permit issuing authority because a state is free to change the limitations established in the draft permit when it issues a final permit. When EPA disapproves a state-developed ICS or conditionally approves a state's draft permit as an ICS, it may at any subsequent time submit a written notification to the state that it intends to issue the ICS, and that permit issuing authority has, therefore, reverted to the EPA. *Id.* However, only upon mailing of this notification does such permit issuing authority pass to the EPA. *Id.*

In this case, North Carolina issued a draft modified NPDES permit for Ecusta Mill to control dioxin discharges. The EPA conditionally approved this draft modification as an acceptable ICS. The EPA, however, did not avail itself of exclusive permitting authority by notifying North Carolina in writing that such authority had reverted to the EPA, nor did the EPA attempt to issue a final permit for Ecusta Mill. Thus, the EPA has not promulgated

anything in this case. It has merely listed Ecusta Mill and its receiving waters on the "B" and "C" lists and conditionally approved a North Carolina developed ICS. These are preliminary steps that precede permit modification proceedings.

Judicial review of these preliminary steps would require the entire administrative process of finding that limitations are necessary to meet water quality standards be conducted twice—once in the listing/ICS process and again in the permitting process. Review by this court at this preliminary stage would lead to piecemeal review and undermine future state administrative and judicial proceedings. Section 509(b)(1)(G) is clear: this court shall have jurisdiction only if the EPA has "promulgat[ed] ... [an] individual control strategy." 33 U.S.C. § 1369(b)(1)(G) (1988). This section does not provide authority for review of the EPA's listing decisions or its conditional approval of a state-developed ICS. Indeed, the fact that Congress provided for review of the EPA's promulgation of an ICS under section 509(b)(1)(G) but made no provision for review of other EPA decisions under section 304($l$) suggests that Congress intended such intermediate steps not be immediately reviewable. In enacting section 304($l$), Congress clearly intended to address "toxic hotspots" in an expeditious manner. *See* 33 U.S.C. § 1314($l$)(1) (1988). Piecemeal review of EPA decisions under section 304($l$) before final permit issuance would thwart this ambitious goal and should not be allowed. We find it unnecessary to look beyond the clear language of section 509(b)(1)(G) in deciding that Glatfelter's request for review should be denied, and we dismiss this petition for review for lack of jurisdiction.

PETITION DISMISSED.